UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

03 APR -3 PM 4: 21

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| vs. | ) | |
| | ) | CV-03-S-0758-S |
| KENNETH K. LIVESAY, ANGELA C. AYERS, | ) | |
| KAY MORGAN, CATHY C. EDWARDS | ) | |
| and VIRGINIA B. VALENTINE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The Securities and Exchange Commission ("Commission") files this Complaint for Injunctive and Other Relief and alleges as follows:

### INTRODUCTION

1. Since at least 1999, HealthSouth Corporation ("HRC"), one of the nation's largest healthcare providers, has overstated its earnings by at least approximately $1.4 billion. This massive overstatement occurred because HRC's founder, chief executive officer ("CEO") and chairman of the board, Richard M. Scrushy ("Scrushy"), insisted that HRC meet or exceed earnings expectations established by Wall Street analysts.

2. When HRC's earnings fell short of such estimates, Scrushy directed HRC's accounting personnel to "fix it" by artificially inflating the company's earnings to match Wall Street expectations. To balance HRC's books, the false increases in earnings were generally matched by false increases in HRC's assets. By the second quarter of 2002, HRC's assets were overstated by at least approximately $1.4 billion, or approximately 20 percent of total assets.

3. At the direction of senior officers, HRC employees with responsibility for various accounts, including: Kenneth K. Livesay, Angela Ayers, Cathy C. Edwards, Kay Morgan, and Virginia Valentine (collectively "Defendants") made or directed the fraudulent adjustments in HRC's financial records necessary to inflate artificially HRC's earnings.

4. Defendants have engaged in, and unless restrained and enjoined by this Court, will continue to engage in, acts and practices which constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1 [17 C.F.R. §§ 240.10b-5 and 240.13b2-1, and 240.13b2-2], and acts and practices that aid and abet HRC's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13].

5. Edwards has also engaged in, and unless restrained and enjoined by this Court, will continue to engage in, acts and practices which constitute and will constitute violations of Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to Sections 20(b), 20(d) and 20(e) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77t(e)] and Sections 21(d), 21(e) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78u-1] to enjoin the defendants from engaging in transactions, acts, practices and courses of business alleged in this

complaint, and transactions, acts, practices, and courses of business of similar purport and object, for an officer and director bar, disgorgement of ill-gotten gains and prejudgment interest, other equitable relief, and for civil money penalties.

7.  This Court has jurisdiction of this action pursuant to Sections 20(b), 20(d), 20(e) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(e) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

8.  Defendants, directly and indirectly, have made use of the mails, the means and instruments of transportation and communication in interstate commerce, and the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

9.  Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Defendants reside within this district.

## THE DEFENDANTS

10. **Kenneth K. Livesay**, age 42, has been Senior Vice President and Chief Information Officer for HRC since 1999. He was an Assistant Controller for HRC from 1989 to November 1999.

11. **Angela C. Ayers**, age 33, has been Vice President Finance-Accounting for HRC since 2002. She began with HRC as a Staff Accountant in 1994 and, over the years, was promoted to Senior Accountant, Accounting Manager, Director of Accounting for HRC's western region and Assistant Vice President.  She was promoted to Vice President in the Accounting Department in 2002.

12. **Cathy C. Edwards**, age 33, joined HRC's accounting department in 1993, with responsibility for fixed assets. In 1999, she became an Assistant Vice President Finance. In 2001 she became a Vice President Finance.

13. **Kay Morgan**, is currently a Group Vice President, Accounting and Assistant Controller, for HRC.

14. **Virginia B. Valentine**, age 33, joined HRC in 1995 as a staff accountant. Over the years, she received promotions to Senior Accountant, and, in 2000, to Assistant Vice President in the Accounting Department.

## OTHERS INVOLVED

15. HealthSouth Corporation was incorporated in Delaware in 1984 and is headquartered in Birmingham, Alabama. HRC is the nation's largest provider of outpatient surgery, diagnostic and rehabilitative healthcare services. It owns or operates approximately 1,800 different facilities throughout the United States and abroad, including inpatient and outpatient rehabilitation facilities, outpatient surgery centers, diagnostic centers, medical centers and other healthcare facilities.

16. HRC's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act. For the year ended December 31, 2001, HRC reported total revenues of $4 billion and net income of $76 million. HRC's stock was listed on the New York Stock Exchange ("NYSE") and was actively traded under the symbol of "HRC."

17. Richard M. Scrushy, age 49, founded HRC and served as its Chairman since 1994. He served as HRC's CEO from 1994 until August 27, 2002. On January 6, 2003, he reassumed the position of HRC's CEO. Shortly after HRC went public in 1986, Scrushy

4

instructed HRC's senior officers and accounting personnel to materially inflate HRC's earnings to match Wall Street analysts' expectations.

18. HRC and Scrushy are defendants in a related matter, SEC v. HealthSouth Corp. and Richard M. Scrushy, Case No. CV-03-J-0615-S, which was filed in this Court on March 19, 2003.

## THE SCHEME TO OVERSTATE EARNINGS

19. Shortly after HRC became publicly traded in 1986, and at Scrushy's instruction, the company began to artificially inflate its earnings to match Wall Street analysts' expectations.   Between 1999 and the second quarter of 2002, HRC intentionally overstated its earnings, identified as "Income Before Income Taxes And Minority Interests," by at least approximately $1.4 billion in reports filed with the Commission.

20. Pursuant to the scheme, on a quarterly basis, HRC's senior accounting personnel presented Scrushy with an analysis of HRC's actual, but as yet unreported, earnings for the quarter as compared to Wall Street's expected earnings for the company.

21. If HRC's actual results fell short of expectations, Scrushy and HRC's Chief Operating Officer provided HRC's accounting staff with the desired earnings per share number and instructed them to "fix it" by recording false earnings in HRC's accounting records to make up the shortfall. It was understood that Scrushy was directing his staff to record false earnings on HRC's accounting records to make up the shortfall.

22. HRC's accounting staff, including at various times Livesay and Edwards, then met to discuss ways to inflate artificially HRC's earnings in order to meet the Wall Street earnings expectations.

23. These meetings were known as "family meetings" and the attendees were known as "family members." During the course of the scheme, Livesay became a "family member."

24. Most of the fraudulent entries to the income statement consisted of reducing a contra revenue account, called "contractual adjustment," and/or decreasing expenses, (either of which increased earnings).

25. The contractual adjustment account is a revenue allowance account that estimates the difference between the gross amount billed to the patient and the amount that various healthcare insurers will pay for a specific treatment. HRC deducted this account from gross revenues to derive net revenues, which were disclosed in HRC's financial statements filed with the Commission.

26. From approximately 1997 through around June 2002, supervisors for Valentine and Ayers instructed them to make entries to HRC's books and records near the end of each quarter that reduced the contractual adjustment account, thereby increasing HRC's revenues. Valentine and Ayers were given specific amounts by which to reduce this account and were told to allocate that amount among various HRC facilities.

27. Valentine and Ayers never received supporting documentation for these entries, understood that these entries would result in an increase to HRC's revenues and knew that the these entries were not proper under Generally Accepted Accounting Principles ("GAAP") and that the entries would be and were reflected in the financial statements that HRC filed with the Commission and would make those statements materially misleading.

28. The "family members" also identified false balance sheet entries to match the false entries to HRC's income statement.  The balance sheet entries were necessary because, under GAAP, any increase in revenue or decrease in expenses is generally matched with either an increase in assets or decrease in liabilities.  The false balance sheet entries were made to, among other accounts, the Property Plant and Equipment ("PP&E") Account; cash account; inventory account; and intangible asset (goodwill) account.

29. The "family members" referred to the difference between actual earnings and Wall Street expectations as "the hole" and the false entries as "dirt" that would fill in the "hole" or "gap."

30. Valentine created suffixes for line items within HRC's general ledger accounts that received false entries so that HRC's Chief Operating Officer could identify the amounts that particular accounts had been falsified.

31. During 1997 and 1998, Livesay directed HRC personnel in charge of the various balance sheet accounts, including Ayers, Edwards and Morgan, to make false entries in their accounts to reach the desired total that matched the false entries to the income statement.

32. In 1999, Edwards's supervisors told her that the false balance sheet entries would be "temporarily parked" in some of the asset accounts over which she had supervision.  Later, senior managers asked her to make the false entries herself.  Edwards was never supplied with any supporting documentation that would justify these entries.  Although Edwards was told that the entries would be temporary, the false entries became a regular practice and "temporary" became "permanent."

33. The amounts "parked" in Edwards' accounts were large, sometimes close to $80 million a quarter, but were broken up and allocated among numerous accounts.

34. Edwards knew that the entries to her accounts were not proper under GAAP and designed to inflate artificially HRC's earnings. She further knew that the inaccurate information in her accounts would be and was reflected in the financial statements that HRC filed with the Commission and would make those statements materially misleading.

35. One of the balance sheet accounts that received false entries as part of the scheme to inflate earnings was HRC's cash account. HRC's cash account was overstated by more than $300 million in the second quarter 2002 Form 10-Q that HRC filed with the Commission. Morgan made false entries and created false reconciliations necessary to falsify HRC's cash account.

36. The scheme to manipulate earnings allowed Scrushy to boast in HRC's 2001 annual report that:

> In 2001 we set new records as we pushed our revenues well over $4.3 billion and celebrated another year of fulfilling Wall Street expectations, maintaining our record as the Fortune 500 company with the second longest streak for meeting or exceeding analysts' expectations. (Emphasis added).

37. Livesay, Edwards and others instructed HRC's accounting personnel to design the fictitious accounting entries to avoid their detection. For example, if the accounting staff decided to increase inventories, it would increase inventory accounts at various HRC facilities by different false amounts because they knew that if amounts were increased uniformly, the auditors might become suspicious.

38. In addition, since the HRC accounting staff knew that auditors questioned additions to the PP&E account that exceeded a certain threshold, they kept the false additions to the PP&E account at a particular facility below that threshold.

39. On some occasions, Edwards and others created and caused to be created false documents to be provided to HRC's auditors for the purpose of concealing the massive accounting fraud.   For example, the names of fraudulently enhanced PP&E accounts were changed to make the false accounts appear routine.

40. In addition, when the auditors questioned a particular false entry to an asset account at one HRC facility, Edwards found an invoice to another facility that approximated the dollar amount of the entry questioned by the auditors, altered the invoice to appear to support the entry in question, and gave the altered invoice to the auditors.

41. Livesay, Ayers, Edwards, Morgan and Valentine and others made and caused to be made false and fraudulent journal entries in HRC's books and records as described above, knowing: (1) that such journal entries would ultimately be reflected in HRC's financial statements and public filings with the Commission; and (2) that HRC's financial statements and public filings would falsely overstate HRC's revenue, earnings and earnings per share.

42. By the conduct described above, Livesay, Ayers, Edwards, Morgan and Valentine and others performed acts that substantially assisted HRC in filing with the Commission annual reports and quarterly reports that materially misstated, among other things, HRC's net income, revenue, earnings per share, assets, and liabilities from at least 1999 until the present.

43. As a result of the scheme, HRC's revenue and earnings were inflated by hundreds of millions of dollars in publicly filed reports.  For example, the Balance Sheet included in HRC's 10-Q for the second quarter of 2002, overstated gross PP&E by approximately $1 billion or approximately 33% of the total PP&E reported.  The amount of cash reported on the same 10-Q was overstated by more than $300 million and the company's total assets were overstated by more than $1.4 billion.

## INSIDER TRADING

44. During the course of the above scheme and while in possession of material non-public information concerning the misleading nature of HRC's financial statements resulting from the scheme, Morgan sold at least 20,000 shares of HRC stock based upon her knowledge of such information.

## CLAIMS FOR RELIEF
## COUNT I—FRAUD

### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

45. Paragraphs 1 to 44 are hereby realleged and are incorporated herein by reference.

46. Defendants Livesay, Ayers, Edwards, Morgan and Valentine, from at least 1999 through the second quarter of 2002, in connection with the offer or sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails,

(a) directly and indirectly employed devices, schemes and artifices to defraud purchasers of such securities;

(b) directly and indirectly obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, not misleading; and

10

(c) engaged in transactions, practices and a course of business which would have operated as a fraud or deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

47. Defendants Livesay, Ayers, Edwards, Morgan and Valentine knowingly, intentionally and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.  In engaging in such devices, schemes and artifices to defraud, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

48. By reason of the foregoing, defendants Livesay, Ayers, Edwards, Morgan and Valentine, directly and indirectly, have violated, are violating and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT II–FRAUD

### Violations of Section 10(b) of the Exchange Act [15. U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

49. Paragraphs 1 through 44 are hereby realleged and are incorporated herein by reference.

50. Defendants Livesay, Ayers, Edwards, Morgan and Valentine, from at least 1999 through the second quarter 2002, in connection with the purchase or sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

   a)      employed devices, schemes, and artifices to defraud;

11

b)    made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c)    engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

51. Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

52. By reason of the foregoing, Defendants, directly and indirectly, have violated, are violating and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**COUNT III-AIDING AND ABETTING ANTIFRAUD VIOLATIONS**

**Aiding and Abetting HRC's Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10-b-5]**

53. Paragraphs 1 through 44 are hereby alleged and are incorporated herein by referernce.

54. Defendants Livesay, Ayers, Edwards, Morgan and Valentine, from at least 1999 through the second quarter of 2002, aided and abetted violations by HRC of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5

12

thereunder which occurred when HRC, in connection with the purchase or sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:

a)      employed devices, schemes, and artifices to defraud;

b)      made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c)      engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

55. Defendants knowingly, intentionally, and/or recklessly provided substantial assistance to the aforementioned fraudulent conduct.  While providing such assistance, Defendants acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard of the truth.

## COUNT IV-AIDING AND ABETTING REPORTING PROVISIONS
### Aiding and Abetting HRC's Violations  of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12-20, 240.13a-1, and 13a-13]

56. Paragraphs 1 through 41 are hereby realleged and are incorporated herein by reference.

57. Defendants Livesay, Ayers, Edwards, Morgan and Valentine, from at least 1999 through the second quarter of 2002, aided and abetted HRC's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, which occurred when HRC filed annual and periodic reports that contained financial statements that were not prepared in conformity with GAAP and contained material misstatements.  Through

13

the conduct described in the above paragraphs, Defendants knowingly or recklessly substantially assisted HRC's violations of this section and rules.

## COUNT V- AIDING AND ABETTING BOOKS AND RECORDS AND INTERNAL CONTROLS VIOLATIONS

### Aiding and Abetting HRC's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]

58. Paragraphs 1 through 44 are hereby realleged and are incorporated herein by reference.

59. Defendants Livesay, Ayers, Edwards, Morgan and Valentine, from at least 1999 through the second quarter of 2002, aided and abetted HRC's violations of Section 13(b)(2)(A) of the Exchange Act, which occurred when HRC failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of HRC's assets.  Through the conduct described in the above paragraphs, Harris knowingly or recklessly substantially assisted HRC's violations of these sections.

60. Defendants, from at least 1999 through the second quarter of 2002, aided and abetted HRC's violations of Section 13(b)(2)(B) of the Exchange Act, which occurred when HRC failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (a) transactions were executed in accordance with management's general or specific authorization; (b) transactions were recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability of assets; (c) access to assets was permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability

14

for assets was compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. Through the conduct described in the above paragraphs, Defendants knowingly or recklessly substantially assisted HRC's violations of this section.

## COUNT V - BOOKS AND RECORDS AND INTERNAL CONTROLS VIOLATIONS

### Violations of Section 13(b)(5) of the Exchange Act
### [15 U.S.C. §§78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder

61. Paragraphs 1 through 44 are hereby realleged and are incorporated herein by reference.

62. Section 13(b)(5) of the Exchange Act prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account required by Section 13(b)(2)(A) of the Exchange Act. Rule 13b2-1 prohibits any person from directly or indirectly falsifying or causing the falsification of any such books, records or accounts. Through the conduct described above, Defendants violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1.

## COUNT VI - LYING TO AUDITORS

### Violation of Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2]

63. Paragraphs 1 through 41 are hereby realleged and are incorporated herein by reference.

64. Exchange Act Rule 13b2-2 prohibits, inter alia, an officer or director of an issuer from, directly or indirectly, making or causing to be made a materially false or misleading statement to an accountant in connection with any audit or examination of the

financial statements of the issuer.  By providing a false invoice to HRC's auditors during the audit of HRC's financial statements, Edwards violated Rule 13b2-2.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Commission, respectfully prays that the Court:

I.

Make findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

II.

Issue permanent injunctions enjoining defendants Livesay, Ayers, Edwards, Morgan and Valentine and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, and each of them:

a.      from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

b.      from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

c.      from violating Section 13(b)(5) of the Exchange Act [15 U.S.C. 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1];

d.      from aiding and abetting violations of Section 17(a) of the Securities Act and Section 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13];

e.      from aiding and abetting violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]; and

16

f.        for Edwards, from violating Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

III.

Issue Orders requiring defendants Livesay, Ayers, Edwards, Morgan and Valentine to disgorge any ill-gotten gains and losses avoided as a result of the conduct alleged in the Commission's Complaint, plus pay prejudgment interest thereon.

IV.

Issue Orders requiring defendants Livesay, Ayers, Edwards, Morgan and Valentine, pursuant to Section 20(d) of the Securities Act [15 U.S.C. 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3) ], and, for Morgan, pursuant to Section 21A of the Exchange Act, to pay civil monetary penalties.

V.

Issue Orders pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] prohibiting Defendants Livesay, Ayers, Edwards and Morgan from acting as an officer or director of any issuer that has a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act [15 U.S.C.§ 78o(d)].

VI.

Issue an Order that retains jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may have been entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

VII.

Grant such other and further relief as may be necessary and appropriate.


Dated: April 3, 2003                              RESPECTFULLY SUBMITTED,


William P. Hicks
DISTRICT TRIAL COUNSEL
Ga. Bar No. 351649
Tel: 404 842-7675


M. Graham Loomis
SENIOR TRIAL COUNSEL
Ga. Bar No. 457868
Tel: 404 842-7622


Alex Rue by WH (delegated authority)
Alex Rue
SENIOR TRIAL COUNSEL
Ga. Bar No. 618950
Tel: 404 842-7616


COUNSEL FOR PLAINTIFF
U. S. SECURITIES AND EXCHANGE COMMISSION
3475 Lenox Road, N.E., Suite 1000
Atlanta, Georgia 30326-1234
(404) 842-7600
(404) 842-7679 fax

18